Eric Todd HART, by and through his guardian ad litem Milton Dale Hart, and Milton Dale Hart, Plaintiffs-Appellees,

v.

WESTERN INVESTMENT AND DEVELOPMENT COMPANY, Inc., a corporation, dba National Trailer Park, Defendant-Appellant,

v.

Carl E. PENMAN, dba Penman Manufacturing & Supply, Third-Party Defendant-Appellee.

No. 136–69.

United States Court of Appeals
Tenth Circuit.

Nov. 5, 1969.

B. L. Dart, Jr., Salt Lake City, Utah (Roe, Jerman & Dart, Salt Lake City, Utah, on the brief), for appellant.

Wendell E. Bennett, Salt Lake City, Utah (Strong & Hanni, Salt Lake City, Utah, on the brief), for appellees.

Before PHILLIPS, BREITENSTEIN and HICKEY, Circuit Judges.

PHILLIPS, Circuit Judge.

Eric Todd Hart, by his guardian ad litem, Milton Dale Hart, and Milton Dale Hart, individually, brought this action against Western Investment and Development Company, Inc.[1] Eric sought to recover damages for personal injuries and Milton, his father, sought recovery for hospital and medical expenses incurred in the treatment of Eric for such injuries, and paid by Milton.

On June 24 and 25, 1966, and at all other times here material, Western owned and operated a trailer park in Salt Lake City, Utah, and as a part thereof maintained a playground constructed by it. Such playground was paved with hard asphalt, which contained no substance to soften it or give it resiliency. At such times it maintained thereon several playground devices, among which was a climbing device called a "monkey tree." The device had three vertical, cylindrical elements. The upper ends thereof were 8 feet, 4 inches from the asphalt surface paving below. Two of them were joined by a round cross member at their tops and with nine spaced rungs, which together with such two elements formed a ladder from the surface of the pavement to the top of the device. The third vertical element was positioned at a right angle to the ladder, and such third element and the vertical element of the ladder nearest to it were joined together by a round

---

1. Hereinafter called Western.

crossbar. Such third element gave stability to the device and also was intended to be used as a sliding pole. A user of the device could climb to the top of the ladder, move over to the third element, and slide down it to the pavement.

The device had two round arms, one of which extended horizontally from the element which formed one side of the ladder, at a point 4 feet, 10½ inches above the surface of the asphalt paving, and the other extended horizontally from the element which formed the other side of the ladder, at a point 5 feet, 11¼ inches above such surface.

The arms were constructed so they could be used as chinning bars, turning bars, and for other acrobatic acts. An expert witness testified that the arms were so constructed that a child could get on them and use them as "twirling devices."

Each arm extended 38 inches from the vertical element to which it was attached. The device had no movable parts and was rigidly constructed.

Western purchased the device from Penman, who manufactured it and delivered it to Western on July 1, 1965. Penman had engaged for a period of more than 30 years in designing and manufacturing playground devices like the one here involved. When Penman delivered the climbing device, he suggested to Western that it install the device in a field west of the paved area and over natural earth, rather than "blacktop." Western's representative rejected the suggestion, stating it had paved and fenced the area, so it could close the gates and keep persons out when it so desired.

Penman also advised Western that the vertical segments should be set in concrete bases submerged 24 inches in the ground; that spaces should be left between the tops of the bases and the surface of the asphalt pavement, and such spaces filled with earth, chips, or sand.

In installing the device, Western constructed the concrete bases so they projected slightly above the paved surface, and the vertical element from which the highest of the two arms extended and the sliding pole element were set in one solid piece of concrete, which extended along that side of the device. Western did not cover either the concrete or any part of the asphalt pavement under or about the device with earth, chips, sand, or other soft or flexible material.

Trial by jury was waived and the case was tried by the court.

Milton, his wife, Marjorie, Eric, and their older son, Brian, checked in at the trailer court on June 24, 1966, and paid for space to park their trailer. That evening, Eric and his brother, Brian, went swimming in the trailer park pool and Eric climbed up part of the way on the ladder of the climbing device, but did not get onto either of the horizontal arms.

On June 25, 1966, Eric was seven and one-half years of age and Brian was nine years of age. On the morning of June 25, 1966, Eric and his brother again went to the playground. Mrs. Hart, while returning to the trailer after disposing of garbage, observed Eric sitting on the highest of the two arms on the climbing device. She testified that he was "perched on the bar [arm]." She described what she meant by the statement "perched" by saying, "He was sitting on a bar [arm] like this, with his hands on the bar [arm], sitting there looking around." She stated that as she looked at him, he fell off the bar [arm], and landed face first on the hard surface under the device; that she ran to him, picked him up, found he was quite limp, and carried him to the trailer. She said there was no part of the device he could reach and grab onto from where he was sitting and break his fall.

Eric was taken initially to the L. D. S. Hospital and after a few hours was transferred therefrom to the Primary Children's Hospital. Both hospitals were located in Salt Lake City, Utah.

As a result of the fall, Eric suffered a cerebral contusion, fractures of the left anterior maxillary bone and of the nasal bone, and facial bruises causing tenderness and swelling of the nonosseous tissues in the area around his left eye and mouth and in and around his nasal bone. Later, the areas around his eyes and the exterior of his nose became black and blue. In addition thereto, the fall may have had some effect on his left arm, in that he did not appear to use it quite as spontaneously as his right arm.

Eric did not remember climbing up on the device or falling from the arm on June 25, 1966. He did remember being in the family automobile and his mother asking for directions to the hospital; a doctor being present with him at the hospital; and someone giving him a mirror with which to look at his face. Although he was not unconscious while in the hospitals, he was bewildered and quite confused and his recollections of events during the time he was going to and while he was in the hospitals were quite vague. While in the Children's Hospital, he also suffered spells of dizziness and vomiting.

After three days in the Children's Hospital, he was discharged to return to his home in Ohio and consult his family physician, from whom he received further treatments.

While traveling from Salt Lake City to his home in Ohio, Eric was lethargic and unsteady and required assistance when he got out of the automobile and moved about. When he arrived home, his nose was swollen and the areas about his eyes and the exterior of his nose were still black and blue. That condition continued until about the beginning of the school year in the fall following the accident. During the school year that followed the accident, Eric was quite inactive and played very little with his brother, Brian.

From the time of the injuries on June 25, 1966, to the time of the trial, Eric suffered from recurring nosebleeds and swelling of the soft tissues of his nose and below his eyes.

By January 1, 1967, the nosebleeds had become somewhat less frequent, but he continued to have them, and his mother testified he suffered from nosebleeds on January 11 and 12, 1969, and also on January 13, 1969, the day she testified with respect thereto. She also testified that on the same days the soft tissues of the upper portion of Eric's nose and of his face below his eyes were swollen.

A medical examination on January 10, 1969, disclosed that the mucosa of his nose was abnormally red and congested.

Dr. Stanley L. Magid, a nose, ear and throat specialist, at the request of counsel for Western, examined Eric on January 10, 1969. At the trial he testified that the fractures of the maxillary and nasal bones had fully knitted and that the fragments of such bones on both sides of the lines of fracture were undisplaced and were in their normal anatomical position.

But in January 1969, when the case was tried, the injuries, resulting from the fall, to the nonosseous tissues of the nose and the facial area adjacent to the nose had not fully healed and such tissues had not returned to their normal condition. And Eric suffered from recurring nosebleeds and swelling of the nonosseous tissues of his nose and face just below his eyes from the time of the injuries on June 25, 1965, up to and during the time of the trial in January 1969.

Prior to the accident, Eric had not suffered from nosebleeds or swelling of the nose and face, and there was no evidence of any trauma or other cause for such bleeding and swelling having occurred or developed after the accident. Hence, it was reasonable to conclude that his continued nosebleeds and swelling of the nose and face and the congestion of the mucosa of the nose were all attributable to the injuries he received when he fell from the device. It is apparent that the court concluded there

was no creditable evidence to the contrary. We agree with that conclusion.[2]

DeWayne Jay, who at the time of the trial was and for the preceding 11 years had been Director, and for four years preceding that period Assistant Director, of Buildings and Grounds of the Davis County Utah School District, testified that when a climbing device like the one here involved is installed and maintained over a recessed area filled with sand, ordinarily a child falling from the device onto sand will not suffer injuries, due to the fact the sand will absorb the impact of the fall and prevent injury to the child; and that over the years he knew of instances where children suffered injuries when they fell from such a device onto hard asphalt or "blacktop" but had never known of a child suffering injuries when he fell from such a device onto a sandy substance.

In addition to other findings, the trial court found that Eric and Milton were business invitees of Western, and that at the time he fell Eric was using the device as an invitee of Western; that Western was negligent in installing and maintaining the device over a hard surface; that Eric's injuries and hospital and medical expenses were proximately caused by such negligence; that such injuries caused him permanent disability; and that neither Eric nor Milton were guilty of contributory negligence, and

neither of them assumed the risk of the injuries which Eric suffered.

The court further found that hospital and medical expenses had been incurred to date by Eric in the amount of $219, and that he was entitled to recover $15,000 general damages and special damages of $219.

The court entered judgment in favor of Eric and Milton for $15,219, and also entered a judgment for Penman on the cross-complaint.

Western filed a notice of appeal from both judgments. However, on Penman's motion, the appeal from the judgment for Penman was dismissed on July 28, 1969.

■ In passing on Western's challenge of the findings of the trial court, we must view the evidence in the light most favorable to Eric and Milton and give them the benefit of all inferences that may reasonably be drawn therefrom, and we should not set aside a finding unless it is clearly erroneous.[3]

We have no doubt of the correctness of the court's finding that Western was charged with knowledge that the manner in which it installed and maintained the device "created an unreasonable risk of harm to persons" using the device. We are of the opinion that it would be obvious to a person of ordinary prudence that the erection and maintenance over a hard asphalt pavement of a climbing de-

---

2. Dr. Magid did testify that it was "very doubtful" that the nosebleeds and swelling from which Eric suffered more than two years after the accident were caused by the injuries he suffered when he fell from the device, and that it would be "most unusual" for the "trauma" suffered at the time of the accident to be "sustained over two years following the accident."

   But in so testifying, he expressed *bare* opinions. He did not testify that upon a consideration of all the pertinent facts, either stated by him or embraced in a question propounded to him, in his opinion the recurring nosebleeds and swelling from which Eric suffered, from the time of the accident up to the time of the trial, were not caused by the

   injuries Eric suffered to the nonosseous tissues of his nose and the areas of his face adjacent thereto when he fell from the device.

3. Lindsey v. Oregon-Washington Plywood Company, 10 Cir., 287 F.2d 710, 711; Glens Falls Insurance Co. v. Newton Lumber & Mfg. Co. and DMH Enterprises, Inc. v. Newton Lumber & Mfg. Co., 10 Cir., 388 F.2d 66, 70; Cassidy Commission Company v. United States, 10 Cir., 387 F.2d 875, 878; Barryhill v. United States, 8 Cir., 300 F.2d 690, 693, 694; Daniel v. United States, 5 Cir., 234 F.2d 102, 106; Stacher v. United States, 9 Cir., 258 F.2d 112, 116.

vice like the one here involved, upon which children of tender years were invited and expected to play and from which they might fall, a not unlikely eventuality, would create a hazardous condition and a danger to such children. Moreover, Western was warned of the inherent danger of so erecting and maintaining such a device over hard asphalt pavement by Penman, who manufactured it. Penman advised Western to install it over dirt, rather than "blacktop," and Western was specifically instructed by Penman to leave recessed spaces over the concrete bases and below the surface of the adjacent paved area and to fill such spaces with earth, chips, or sand. Western did not heed either such warning or instruction.

Under the undisputed evidence, Eric and the other Harts were paying guests at Western's trailer park, and Eric, at the time of his injuries, was playing on the device as Western's paid business invitee.

■ The law of Utah, which is here controlling, imposed a duty on the part of Western to use greater care for the safety of children of tender years, who, as its invitees and paying guests, played upon the devices in its playgrounds, than it would have imposed had they been mature persons. Utah law also requires the owners of hotels, motels, and trailer parks and their attendant playgrounds to take far greater measures to secure the safety of their paying patrons than a householder would be required to take for the safety of a social or even a business guest; and it requires such owners to possess a greater knowledge of the dangerous qualities of their hotels, motels, and trailer parks and the appurtenances thereto than it requires of such owners' patrons. And it imposes upon such owners the duty to take proper action to protect their patrons from such dangers. See Wheeler v. Jones, 19 Utah 2d 392, 431 P.2d 985, 987, 988.

In its opinion in Wheeler v. Jones, supra, at page 988, the court said:

"Negligence is the breach of a duty to use due care under the circumstances of the situation. When children are involved, the duty to look out for their safety is increased, and failure to make a given discovery might be negligence when children are involved and not negligence if adults only are affected. It is a relative thing and generally must be left to the jury to say if under all the circumstances the conduct of the actor measures up to the standards of a reasonably prudent man.

\* \* \* \* \* \*

"All the world must know the tendency of children \* \* \* not to have the judgment and maturity of adults."

■ We hold that the questions of negligence, contributory negligence, and assumed risk, under the evidence and the inferences reasonably deductible therefrom, were questions, not of law but of fact, for the determination of the trial court as trier of the facts.

■ We are of the opinion that the trial court properly applied the law of Utah, and that the evidence afforded ample and substantial support for the court's findings: That Western was negligent in installing and maintaining the climbing device over the "hard surface ground covering"; that Eric's injuries and costs of hospital and medical treatment were proximately caused by Western's negligence; that Eric was not contributorily negligent and did not assume the risk of playing on the device in the manner in which he did; that Eric suffered a cerebral contusion and fractures of his left anterior maxillary bone and his nasal bone and injuries to the nonosseous tissues of his nose and areas of his face adjacent to his nose, and that such injuries caused him permanent disability. And we are of the opinion that such findings are not clearly erroneous.

Counsel for Western attempt to minimize Eric's injuries and urge that they were not permanent. The accident occurred on June 25, 1966. From that

time until mid-January 1969, when the case was tried, a period of two years, six and two-thirds months, Eric suffered from nosebleeds and swelling of his face and nose. An examination made for Western by a medical doctor on January 10, 1969, disclosed a deviation of the nasal septum; that the entire lining of the nose was abnormally reddened, and that the entire mucous membrane of the nose was congested and swollen.

■ We think that such conditions that had existed for two and one-half years after the accident—the recurring nosebleeds and swelling—justified the court in finding that the injuries were permanently disabling.

■ With respect to the amount of the damages, we are of the opinion, based on the evidence and findings of the trial court that Eric suffered serious, painful, and permanently disabling injuries, when consideration is given to the 1969 dollar value, the general damages awarded were not excessive.

We are also of the opinion that under the requirements of Rule 52(a) of the Federal Rules of Civil Procedure, as stated by this court in State of Utah v. United States, 10 Cir., 304 F.2d 23, 26, 27, the findings are sufficiently specific. They give this court a clear understanding of the basis of the trial court's decision.

■ Finally, we are of the opinion that the court did not err in holding the evidence proffered by Western of the absence of prior accidents on the climbing device inadmissible to show lack of knowledge of the danger by Western. In Erickson v. Walgreen Drug Co., 120 Utah 31, 232 P.2d 210, 31 A.L.R.2d 177, relied on by Western, the unsafe condition was latent, not patent. Here, the danger was clearly obvious to a person of ordinary prudence. Moreover, Western had been advised not to install the device over hard asphalt pavement, and had been instructed to cover the cement bases with soft material. Surely, Western, under the undisputed evidence, was

conscious of the danger resulting from the way it installed and maintained the climbing device.

The judgment is affirmed.