Alvin H. WRIGHT et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America et al.,
Defendants-Appellants.

No. 76–1497.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 3, 1977.

Decided Dec. 22, 1977.

Rehearing Denied Feb. 15, 1978.

William S. Andrews of Andrews, Marenda & Moseley, Phoenix, Ariz. (C. R. Henriksen and D. Clayton Fairbourn, Salt Lake City, Utah, on the brief), for plaintiffs-appellees.

Donald Etra, Civ. Div., Appellate Section, Dept. of Justice, Washington, D.C. (Rex E. Lee, Asst. Atty. Gen., Ramon M. Child, U.S. Atty., Salt Lake City, Utah, and Ronald R. Glancz, Civ. Div., Appellate Section, Dept. of Justice, Washington, D.C., on the brief), for defendants-appellants.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Appellant, United States, seeks review of an adverse judgment following trial to the court in a wrongful death action brought under the Federal Tort Claims Act (28 U.S.C.A. § 1346). Such actions may be main-

tained against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

In the early 1960's the State of Utah Highway Department initiated plans for the construction of a bridge on Highway 262 over McElmo Creek in San Juan County, Utah. Thereafter, due to a lack of funds on the part of the State, the Bureau of Indian Affairs (BIA) of the Department of the Interior was asked to help with the construction of the bridge. In 1964, utilizing Utah's designs for the bridge, and its own designs for the approach roads, the BIA built the bridge, with the State of Utah controlling and deciding upon its location and placement. Upon completion of the bridge and the approaches, and the final paving by the State of Utah, the bridge and approaches were accepted into the highway system for the State of Utah in 1965. Utah, at that time, assumed full and sole responsibility for maintaining the bridge and approach roads.

Five years later commencing September 4, 1970, and continuing through September 5, 1970, a rainfall of record proportion in the area of the bridge precipitated flooding, which caused portions of the approach roads to the bridge to be washed away. On September 5, 1970, Richard and Nancy Fellars were killed when, apparently unable to traverse the washed out approach road, their car went out of control and into McElmo Creek.

Plaintiffs, guardians of the Fellars' children and executor of their estates, brought this action alleging, inter alia, that the defendant, United States, by and through its agents, had "negligently designed, placed, located, constructed, inspected and managed the McElmo Creek Bridge and its approaches and that as a result of the aforesaid negligence the Fellars were wrongfully

killed. United States denied negligence and argued that the accident was caused by the Fellars' own negligence, that the Fellars assumed the risk of the accident in question, that the accident resulted from unforeseen extraordinary natural forces, and that the accident was unavoidable.

At trial each side presented numerous witnesses relative to the design, construction, and location of the bridge and the approach roads, a diversionary works placed upstream from the bridge and approaches, and the size and nature of the storm which precipitated the Fellars' accident. The testimony alone encompasses over 1,000 pages of the record on appeal. After all the evidence was submitted, the trial court found the United States negligent and awarded plaintiffs damages totaling $230,400. In so doing, the trial court found, inter alia, that the bridge and approaches thereto were negligently designed and constructed without adequate or reasonable concern for hazards that would be created during floods, that the approaches were improperly constructed of finely grained material inadequate to prevent erosion by flood materials, that the diversionary works were poorly designed and constructed and not adequately maintained, that a reasonably prudent engineer would not have placed the bridge over the low flow channel but would have located the bridge so as to cross over the flood channel, that the defendants' negligence was the proximate cause of the flood breaking through the approach road, that there was no credible evidence to indicate that the Fellars were negligent, that having opted to construct the bridge and approach roads the defendants were chargeable with performing same in a non-negligent manner, and that the State of Utah's acceptance and maintenance of the bridge and the approaches "did not constitute independent, intervening causes which would break the chain of causation between the negligent acts of defendants' agents and the deaths of the Fellars."

On appeal United States contends that: (1) the trial court was clearly erroneous in finding it negligent; (2) the September 4–5,

1970, flood was an act of God which relieved it of any liability; (3) the subsequent acceptance and maintenance of the bridge and approaches by the State of Utah relieved it of any liability; (4) the liability of the United States is barred by the "discretionary function" exception to the Federal Tort Claims Act; and (5) 33 U.S.C. § 702c immunizes it from any liability caused by floods. Because of their dispositive nature, only issues (1), (3) and (4) will be discussed.

## I.

United States contends that the trial court was clearly erroneous in finding it negligent. Under Fed.R.Civ.Proc. rule 52(a), 28 U.S.C.A., findings of a trial court will not be disturbed on appeal unless they are held to be clearly erroneous. *Volis v. Puritan Life Insurance Company*, 548 F.2d 895 (10th Cir. 1977); *Joyce v. Davis*, 539 F.2d 1262 (10th Cir. 1976). Courts of appeals must view evidence and all reasonable inferences therefrom in the light most favorable to the prevailing party. *Joyce v. Davis, supra; Hart v. Western Investment and Development Company*, 417 F.2d 1296 (10th Cir. 1969). Findings of a trial court are, necessarily, presumed correct and will not be reversed unless they are clearly erroneous. *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974). Applying these standards to the facts of the case at bar, and ever mindful that appellate courts cannot try cases *de novo, Ahern v. Veterans Administration*, 537 F.2d 1098 (10th Cir. 1976), we hold that the trial court was clearly erroneous in finding the United States negligent.

David Sargent, Chief Structural Engineer for the State of Utah Highway Department at the time of the accident, testified that:

Q. Did you have ultimate responsibility for the design of the bridge.

A. I had ultimate responsibility.

[R., Vol. IV, p. 617.]

Sargent further testified that Utah not only designed the bridge but it also controlled the location and placement of the bridge:

Q. Now, you're familiar with what we've been referring to as a high flow channel?

A. Yes.

Q. Was there any discussion of placing the bridge over that channel?

A. There very likely was. I do not recall any specific discussion.

Q. Who had the ultimate decision in determining the placement of the McElmo Creek bridge?

A. As a chief structural engineer, I would have to assume that responsibility.

[R., Vol. IV, p. 629.]

The bridge was designed by the State of Utah to withstand a flood of a calculated magnitude that would occur only once every 25 years. Ward Morby, hydraulic engineer for the State of Utah at the time of the accident, testified that:

Q. Did you perform a hydraulic design with respect to the McElmo Creek bridge?

A. Yes.

Q. Was that design prepared under your direction?

A. Yes, it was.

Q. What hydraulic information did you consider necessary for examination?

A. First of all, we would, of course, work out the hydrologic data. This is the place you would normally start this type of an investigation.

Q. What hydrologic data did you work up?

A. We were to arrive at a design for this particular crossing that was selected for a 25-year design frequency.

Q. Why was a 25-year design frequency selected?

A. This was the design frequency that the Highway Department felt that they could justify expending their funds on for a road with the amount of traffic that the road would be subject to.

\*    \*    \*    \*    \*    \*

A. Well, normally they felt—and I guess this is—you have to do based on experience you have—that they would not be justified or could not economically justify spending those additional funds for a higher design frequency than 25 years.

[R., Vol. V., pp. 772–773.]

The bridge was accordingly designed for a 25-year design frequency. The evidence presented at trial was that the storm in question generated a flow of 13,100 c.f.s. Such a flow would normally occur only once every 42 or 55 years.[1] Plaintiff's own expert also acknowledged that the bridge, as designed, would withstand a 10–20,000 c.f.s. flow. Under these circumstances, and in view of the utilization of the available expert hydrological and geographical data, we cannot hold that the State of Utah was negligent in designing the bridge in the manner it did, or that the United States was negligent in utilizing such a design and placing it in the location directed by the State of Utah.

██ Further, in consideration of these circumstances we also hold that the BIA was not negligent in designing and constructing the approach roads for the bridge, since the design of the bridge over the low flow channel required that the approach roads be placed in the flood channel. Sargent testified:

Q. Mr. Sargent, you were actually aware of the location of the high channel when you designed the bridge, were you not?

A. Yes.

Q. And yet the bridge was not placed over that high channel, was it?

A. No.

Q. Did you not make that ultimate determination not to place it over the high channel?

A. Well, I've answered earlier that I'll assume that responsibility, yes, sir.

Q. Now, if the bridge were not placed there, did you know that the approaches would have to go in that high water channel?

A. Yes.

[R., Vol. IV, pp. 649–650.]

The design and location of the bridge dictated the location of the approach roads. Accordingly, we hold that the United States was not negligent in designing and constructing the approach roads when, (a) the plans for the approaches were approved by the district engineer for the State of Utah Highway Department, and (b) the design and construction of the approach roads were in accordance with the applicable federal specification requirements as delineated in "FP–61—Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, January, 1961"[2], U.S. Department of Commerce, Bureau of Public Roads. It is particularly significant, we believe, that the State of Utah undertook all of the final paving for the bridge and the approaches and thereafter assumed full and sole responsibility for maintenance of the bridge and its approaches after accepting them into the state highway system.

## II.

██ United States contends that the subsequent acceptance and maintenance of the bridge and its approaches by the State of Utah relieved it of any liability. In Federal Tort Claims Act suits the law of the place where the alleged negligent conduct or omission occurred must be applied. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 1 Barron & Holtzoff (Wright Ed.), § 54, pp. 294–297; *Ahern v. Veterans Administration, supra*. The United States here may be likened, for purposes of liability, to the independent con-

---

1. One of the plaintiff's expert witnesses did testify that in his opinion a storm of the September 4–5, 1970, size would reoccur every 15 to 17 years but that also, in his opinion, there was not much hydrological data available when the bridge was designed and that a significantly larger record "would be necessary to adequately design such a project."

2. The record fails to disclose that compliance with these standards gives rise to negligent construction or design.

tractor in *Leininger v. Stearns-Roger Manufacturing Company*, 17 Utah 2d 37, 404 P.2d 33 (1965). The court there opined that a contractor is not liable for resultant injuries if he has merely carried out plans, specifications and directions given to him by an employer, at least when the plans are not so obviously dangerous that no reasonable man would follow them. The court said:

This court is familiar with the general rule as to the non-liability of an independent contractor after the acceptance of the work by the owner, as well as with the exceptions to this rule and the so-called "modern view." 13 A.L.R.2d 195, 58 A.L.R.2d 869. However, each case must be decided on the basis of its own facts and seldom are two cases identical.

The so-called "modern view" has the effect of applying to construction contractors the landmark standard promulgated in *MacPherson v. Buick Motor Company*, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, but does not have the effect of making the contractor absolutely liable to third persons if the contractor was free of negligence. *An important limitation on the rule placing building contractors on the same footing as sellers of goods is that the contractor is not liable if he has merely carried out the plans, specifications and directions given him, since in that case the responsibility is assumed by the employer, at least when the plans are not so obviously dangerous that no reasonable man would follow them.* The rule, as stated in *Ryan v. Feeney & Sheehan Bldg. Co.*, 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1 (1924), which is the same court which earlier had decided *MacPherson v. Buick*, supra, is as follows:

* * * A builder or contractor is justified in relying upon the plans and specifications which he has contracted to follow, unless they are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury.

And this rule was followed and cited approvingly by Judge Learned Hand in *Per-*

*son v. Cauldwell-Wingate Co.*, 2 Cir., 187 F.2d 832, cert. den. 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951). See also: *Russell v. Arthur Whitcomb, Inc.*, 100 N.H. 171, 121 A.2d 781; *Tipton v. Clower*, 67 N.M. 388, 356 P.2d 46; *Trustees of the First Baptist Church of Corinth v. McElroy*, 223 Miss. 327, 78 So.2d 138; *Davis v. Henderlong Lumber Company*, D.C., 221 F.Supp. 129 (1963). (Emphasis supplied.) 404 P.2d at p. 36.

We hold that under *Leininger, supra*, the United States cannot be held liable, considering all of the facts and circumstances in this record, for any accident which resulted from the design and construction of the approach roads since Utah designed and located the bridge and Utah subsequently accepted and agreed to maintain the bridge and approach roads.

### III.

United States further contends that its liability is also barred by the "discretionary function" exception to the Federal Tort Claims Act under § 2680(a). We agree.

28 U.S.C.A., § 2680(a) provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The actions of the Bureau of Indian Affairs of the Department of the Interior in aiding Utah in the construction of the bridge and approach roads were clearly actions "in the execution of a statute."

23 U.S.C.A., § 208 provides *inter alia*:

(a) Funds available for Indian reservation roads and bridges shall be used to

pay for the cost of construction and improvement thereof.

\* \* \* \* \* \*

(d) Cooperation of States, counties, or other local subdivisions may be accepted in such construction and improvement . . . .

Actions performed under statutory authorizations such as § 208, *supra*, were intended to fall within the "discretionary exemption" of the Tort Claims Act. In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court significantly opined:

> . . . On the other hand the Committee's reports explain the boundaries of the sovereign immunity waived, as defined by this § 2680 exception, with one paragraph which appears time and again after 1942, and in the House Report of the Congress that adopted in § 2680(a) the limitation in the language proposed for the 77th Congress. It was adopted by the Committee in almost the language of the Assistant Attorney General's explanation. This paragraph characterizes the general exemption as "a highly important exception, *intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious . . The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion.* (Emphasis supplied.)

346 U.S. at pp. 28–30, 73 S.Ct. at p. 964.

The court in *Dalehite, supra*, further expounded on the breadth of the "discretionary exception":

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that can-

not form a basis for suit under the Tort Claims Act *includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.* It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. *If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.* (Emphasis supplied.)

346 U.S. at pp. 35, 36, 73 S.Ct. at p. 968.

*See also: First National Bank In Albuquerque v. United States*, 552 F.2d 370 (10th Cir. 1977).

Thus, § 2680, *supra*, as interpreted in *Dalehite, supra*, and recognized by this court in *First National Bank In Albuquerque, supra*, broadly applies the "discretionary exemption" to liability under the Tort Claims Act to include not only the "initiation of programs and activities," but also "determinations made by executives or administrators in establishing plans, specifications or schedules of operations." Applying these standards to the facts herein, we hold that the Bureau of Indian Affairs was engaged in a "discretionary function" when it determined to aid and assist the State of Utah in the construction of the bridge and approach roads as authorized under 23 U.S. C.A., § 208.

In Tort Claims actions we must be mindful that the United States is liable as an individual only in the manner and to the degree to which it has consented. *United States v. Gregory*, 300 F.2d 11 (10th Cir. 1962); *Powell v. United States*, 233 F.2d 851 (10th Cir. 1956). The "discretionary function" exemption to tort liability is auxiliary to the government's ability to formulate and implement policy. It is within this frame of reference that we have previously

held that the United States cannot be held liable for damages to a marina owner for the drawdown of water from a flood control reservoir, *Spillway Marina, Inc. v. United States*, 445 F.2d 876 (10th Cir. 1971), or for damages for following its contract specifications (density to which earth backfills must be compacted) where subsequent flooding damaged property. *Irzyk v. United States*, 412 F.2d 749 (10th Cir. 1969).

We thus hold that the Bureau's decision to aid and assist the State of Utah in constructing the bridge and approach ways in this case comes within the discretionary exemption of the Tort Claims Act. Accordingly, neither its adoption or implementation of "plans, specifications, or schedules of operations" for the project gave rise to a viable cause of action under the Act.

REVERSED.

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent.

To me, this is a compelling case for recovery in these tragic circumstances where proof of negligence by the BIA in designing and constructing the approach which washed out and the diversionary dike strongly supports Judge Anderson's findings. I cannot agree that he erred in holding that Utah law on independent contractors does not absolve the Government of liability. And application of the discretionary function exception to bar recovery for these localized acts of negligence in designing and building the approach road and dike is an unwarranted expansion of the exception, in my judgment.

I turn first to the discretionary function exception because it is jurisdictional in nature. *Smith v. United States*, 546 F.2d 872, 875–76 (10th Cir.).

A

*The discretionary function exception*

The Federal Tort Claims Act makes two separate exceptions from the waiver of immunity granted by the statute. 28 U.S.C. § 2680(a) first provides an exception as to any claim "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid  . . ." Second, an exception is granted as to any claim ". . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Dalehite v. United States*, 346 U.S. 15, 32–33, 73 S.Ct. 956, 959, 97 L.Ed. 1427.

The majority opinion holds that both exceptions of § 2680(a) apply here. First, the opinion says that the actions of the BIA in aiding Utah in the construction of the bridge and approach roads were clearly carried out "in the execution of a statute," citing 23 U.S.C. § 208 which provides for use of funds to pay for construction and improvement of Indian reservation roads. I cannot agree that this first exception of § 2680(a) applies. This exception "deals with acts or omissions of government employees, exercising due care in carrying out statutes or regulations whether valid or not. It bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, supra, 346 U.S. at 33, 73 S.Ct. at 966. This is not such a case because no challenge to 23 U.S.C. § 208 or any regulation is involved. Nor is this a case like *Powell v. United States*, 233 F.2d 851 (10th Cir.), challenging Governmental acts in issuing permits, allegedly to the wrong party, but which were acts done in furtherance of applicable statutes and an applicable regulation. As discussed below, I am convinced that the findings of negligence in this case should stand, and the first exception of § 2680(a) cannot apply since the Government agents were not "exercising due care" in the enforcement of federal law. *Hatahley v. United States*, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065.

The principal discussion of § 2680(a) by the majority opinion focuses on the second part of the section dealing with the exercise of a discretionary function or duty. The opinion says that the exception covers de-

terminations made by executives or administrators in establishing plans, specifications or schedules of operations, and that under the standards applied in *Dalehite* and other cases, the BIA was engaged in exercising a discretionary function in its activities in question so that the Government is immune from suit. I must disagree.

If the majority's expansive interpretation is made of the exception and the *Dalehite* references to "plans, specifications or schedules of operations," then it is hard to imagine an independent similar act by an engineer or other Government employee which would not be immunized from the possibility of relief under the Act. See *Griffin v. United States*, 500 F.2d 1059, 1063–64 (3d Cir.); *Smith v. United States*, 546 F.2d 872, 877 (10th Cir.). In my opinion, this is contrary to the intent of the statute, the *Dalehite* case, and numerous well-reasoned decisions. It is true that *Dalehite* says that more than the initiation of programs comes within the exception and that it includes "determinations made by executives or administrators in establishing plans, specifications or schedules of operations." However, the opinion is clear in stating that it is "[w]here there is room for policy judgment and decision [that] there is discretion. It necessarily follows that acts of subordinates in carrying out operations of government in accordance with official directions cannot be actionable." *Dalehite v. United States*, supra, 346 U.S. at 36, 73 S.Ct. at 968.

Thus, for the exception to apply the acts in question must be steps directed by a planning-level *policy* decision. See *Seaboard Coast Line R.R. v. United States*, 473 F.2d 714, 716 (5th Cir.); *Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir.); compare *Boyce v. United States*, 93 F.Supp. 866,

868–69 (S.D.Iowa). Under the *Dalehite* test it is only those plans which involve such policy considerations that are protected by the exception, *Dalehite*, supra, 346 U.S. at 35–36, 73 S.Ct. 956, and the "plans" involved here were not shown to have been of that type in any sense.

The burden was on the Government to establish such elements of the exception. *Boyce v. United States*, supra, 93 F.Supp. at 868. There was no showing of any weighing of considerations like those recognized in *Dalehite* as typically involved in policy judgments—the feasibility of a program balanced against present knowledge of the effect of procedures proposed, costs and delays against alternative safety measures, and the like. *Dalehite*, supra at 40–41, 73 S.Ct. 956. Absent such considerations, the Act intends the Government to be held accountable under the standard it adopted—that of liability of a private person to compensate victims of negligence. *Indian Towing Co. v. United States*, 350 U.S. 61, 68, 76 S.Ct. 122, 100 L.Ed. 48.

Furthermore, the Government did not demonstrate that any planning-level policy decision dictated the design and construction of the approach road and dike, the omission of riprap, or the use of loose materials in the approach and dike.[1] The exception was applied in *Dalehite* because the Court concluded that "[e]ach of these acts looked upon as negligence was directed by this Plan." *Dalehite v. United States*, supra, 346 U.S. at 39, 73 S.Ct. at 969. Unlike *Dalehite*, the decision to build the diversionary dike was made on the site by the BIA engineer who supervised the actual construction, and was not directed by any "plan."[2]

---

1. Applying similar reasoning, in *Bryant v. United States*, 565 F.2d 650 (10th Cir.), we recently held that a decision not to have supervisory personnel outside on grounds of BIA schools was not caused by a policy to relax rigid militaristic practices. The failure to properly carry out outdoor supervisory duties was therefore not within the discretionary function exception.

2. The record in no way establishes that a federal planning-level policy decision was handed down which directed doing the acts looked

upon as negligence. *Dalehite*, supra at 36, 39, 73 S.Ct. 956. Mr. Gillam, a BIA engineer, served as the supervising contractor and contract inspector on the project. On such "force account projects," the resident engineer is given quite a bit of leeway. (R.V. at 689, 701–02, 708, 710, 733–34, 751).

A brief history of the planning of the bridge also indicates an absence of policy judgment. Mr. Sargent, the chief structural engineer for the Utah Highway Department at the time,

Moreover, the broad interpretation of the discretionary function exception made by the majority runs counter to numerous well-reasoned decisions. We have held that failure to erect safety devices or warning signs near a dangerous thermal pool does not come within the exception. *Smith v. United States*, supra, 546 F.2d at 876–77. Failure to provide guard rails on a bridge crossing an irrigation ditch or a fence by the ditch was held not to be an exempt discretionary function. *Foster v. United States*, 183 F.Supp. 524, 527–28 (D.N.M.), affirmed on other grounds, 280 F.2d 431 (10th Cir.). Where decisions not to install appropriate warning devices, barriers, speed control devices or cross walks for the protection of pedestrians at an Air Force base were not shown to have been made at a planning level, summary judgment based on the exception was reversed. *Driscoll v. United States*, supra 525 F.2d at 138. And Government construction of a drainage ditch casting an unnatural concentration of water and mud on railroad property was also held not to be a discretionary policymaking function, but an operational one which the Government was obligated to perform in a non-negligent manner. *Seaboard Coast Line R.R. v. United States*, supra, 473 F.2d at 716.[3]

The *Seaboard* case is of special importance not only because it involved negligent design by the Government, but also because of express approval of its holding by our court. In *Jackson v. Kelly*, 557 F.2d 735, 738 (10th Cir.), our recent, unanimous en banc opinion stated:

> For example, negligence in the construction of a government facility is nondiscretionary and subjects the government to liability under the FTCA. See *Seaboard Coast Line R.R. v. United States*, 5 Cir., 473 F.2d 714.

We are reminded that "[t]he Federal Tort Claims Act waives the Government's immunity from suit in sweeping language." *United States v. Yellow Cab Co.*, 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523. In interpreting the exceptions to the general grant of immunity, the courts include only those circumstances within the words and reason of the exception. *Dalehite*, supra, 346 U.S. at 31 n. 24, 73 S.Ct. 956; *First National Bank in Albuquerque v. United States*, 552 F.2d 370, 376 (10th Cir.), cert. denied, —— U.S. ——, 98 S.Ct. 122, 54 L.Ed.2d 96. To apply the exception as broadly as the majority opinion does here is to allow the exception to swallow up the Act.

---

testified that the State of Utah completed plans and specifications for only the bridge proper, but not the approaches other than an oil surface. He said the Utah plans for the approach road were incomplete when turned over to the BIA. (Id. at 611–12). As noted below, the final BIA plans were later submitted to an engineer of the Utah Highway Department for his approval. (Id. at 634–35).

These plans included no item for riprap. (R. V 850). Mr. Gillam said the plans indicated that "fill" was to be used in construction of the approach embankment, that the specifications for the fill were to be determined under FP–61, but that he had discretion in choosing where the fill material was to be obtained.

The diversionary dike was added to attempt to direct the flow of water, which might rise out of the regular channel onto the broader flood plain, back under the bridge. However, the trial court found that the dike focused the high water flow channel against the end of the approach road and that the dike was poorly designed and constructed of loosely defined materials. (Findings of Fact 7 and 8, R. VIII 3).

**3.** I cannot agree that *Spillway Marina v. United States*, 445 F.2d 876 (10th Cir.), or *Irzyk v. United States*, 412 F.2d 749 (10th Cir.), support the conclusions of the majority opinion. The *Spillway Marina* case involved property damage resulting from a drawndown of a reservoir. We held that the attainment of objectives of flood control and navigation required discretionary decisions on the storage and release of water and thus the manner of their exercise was within the exception, including failure to warn. No such policy objectives are shown to be involved here.

*Irzyk* involved property damages from flooding after seepage from a canal which was built by a subcontractor under a Government contract. However, the attack was on general contract provisions and specifications for all earthwork, which were held to be a discretionary function; there was no claim of negligence at the local operational level. See 412 F.2d at 751. The cases are thus both unlike our case which challenges specific engineering acts at this approach and dike.

Therefore, I must dissent and would affirm the trial judge's conclusion that the discretionary function exception does not apply.

### B

#### The independent contractor defense

The Government relies heavily on the argument that it was in a position analogous to that of an independent contractor, that the project was accepted by the State and subsequently maintained by it, and that the *Leininger* Utah opinion, 404 P.2d 33, frees it of liability in these circumstances. (Brief for the Appellants, 23–26). The majority opinion agrees, stating that under *Leininger* the Government cannot be held liable.

First, the facts of the *Leininger* case and its limited holding are crucial. There an employee of Texas Zinc Minerals Corporation sought damages for injuries sustained during his work from the explosion of an exhaust fan he was dismantling. He sued Stearns-Roger Mfg. Co., a general contractor which built the plant and installed the fan almost four years earlier. Summary judgment for Stearns-Roger was affirmed, the Utah Court pointing out that Texas Zinc had contracted for the construction of the plant by Stearns-Roger as a general contractor, that the contract contemplated that Texas Zinc would specify certain equipment items and Texas Zinc did specify the fans in question, and that the contract stipulated that Stearns-Roger would have no responsibility for the adequacy of properly installed major items of equipment which were selected by Texas Zinc. The Utah Court concluded that the rule of non-liability of independent contractors applied. Among other things the Court emphasized that:

. . . The defendant contractor, in the instant case, was a mere vehicle, a conduit through which the Durco fans passed; *it did not design, sell or recommend the installation of such fans, and had no discretion in their selection; there was no claim of any act of negligence on* *defendant's part in the placement of the fans in the laboratory of Texas-Zinc pursuant to specifications*; . . . (Emphasis added). 404 P.2d at 36.

Finally, we note that the Utah Court stressed the fact that the fans were not the product of the defendant Stearns-Roger's work and that when they were placed no one was aware of any hazard incident to their intended use. Id. at 38.

Our case is wholly different, in my opinion. We must remember that it was not the bridge but the approach road which washed out and caused this tragedy. The Government flatly admits that the State plans covered only the bridge itself and not the approach roads, that the approaches to the bridge were designed by the BIA, these plans however being later submitted to and approved by the State. (Brief of the Appellants, 5). The Government negligence found by the trial judge was dereliction when the BIA itself designed and built the approach road and diversionary dike. (Findings of Fact 4, 5 and 8, R. VIII, 160–61).[4] Our case is thus unlike *Leininger* where the contractor Stearns-Roger did not design or choose the fans and was not even alleged to have been negligent in the placement of them. See 404 P.2d at 36. And in our case there is no contract provision freeing the Government from liability as a contractor, which was stipulated in the *Leininger* contract. Id. at 35. In fact, on this "force account" project there was *no* contract entered into by the BIA.

In view of these sharp contrasts it is understandable that the trial court held that the *Leininger* rule was inapplicable in our case, and I fully agree. Since the BIA itself did the designing and building of the approach road and the diversionary works, and since these functions were found to have been negligently performed, the reason for non-liability under the independent contractor rule and the *Leininger* case does not exist. *L. H. Bell & Associates, Inc. v. Granger*, 112 Ariz. 440, 543 P.2d 428, 433–34; see also *Baker v. Fryar*, 77 N.M. 257,

---

**4.** See Part C, infra.

421 P.2d 784, 786–87; *Wright v. Creative Corp.*, 30 Colo.App. 575, 498 P.2d 1179, 1181–82; *Totten v. Gruzen*, 52 N.J. 202, 245 A.2d 1, 5.

*L. H. Bell & Associates, Inc. v. Granger*, supra, is of special significance because of its striking similarities to our case.[5] Recovery was sought there for property damages due to negligence of the defendant in planning and designing approaches to a bridge without proper culverts and dikes. It was argued that the plans were accepted by the county so that the defendant was relieved of liability. The Arizona Court said that its general rule of non-liability of the contractor where work was completed and accepted did not apply; that the rule applies only where the contractor has no discretion and merely follows the plans and specifications provided by the employer; and that the fact of approval of the plans by the county did not relieve the designer, Bell, of liability for the inadequate approaches which caused the damages. 543 P.2d at 433–34. This same reasoning applies here.

This very question of the applicability of the rule of non-liability of independent contractors and the *Leininger* case was argued at length to Judge Anderson on essentially the same contentions presented to us. (R. VII, 1128–35). The trial judge rejected the argument that the non-liability rule applies. (Id. at 1135). Then later in his written conclusions of law the court held that "the State of Utah's acceptance and maintenance of the highway system did not constitute independent, intervening causes which would break the chain of causation between the negligent acts of defendants' agents and the deaths of the Fellars, and the injuries suffered by their son." (Conclusion of Law No. 3, R. VIII, 164). In so ruling, the Court applied the same reasoning as that of the New Mexico Court in *Baker v. Fryar*, supra, 421 P.2d at 786–87.

In the *Leininger* case, the Utah Court noted that there are exceptions to the rule

of non-liability after acceptance of an independent contractor's work, and the Court stated that each case must be decided on its own facts. 404 P.2d at 36. Here, the trial court made just such a determination on these particular facts. When such a determination is made on the law of his State by a resident federal trial judge, his views are persuasive and are ordinarily accepted. *Sade v. Northern Natural Gas Co.*, 483 F.2d 230, 234 (10th Cir.); *Teague v. Grand River Dam Authority*, 425 F.2d 130, 134 (10th Cir.); *Parsons v. Amerada Hess Corp.*, 422 F.2d 610, 614 (10th Cir.) (a case involving the liability of independent contractors); *Bartch v. United States*, 330 F.2d 466, 467 (10th Cir.) (a decision under the Federal Tort Claims Act). A similar rule of deference is applied by the Supreme Court. See *Bishop v. Wood*, 426 U.S. 341, 346–47 n. 10, 96 S.Ct. 2074, 48 L.Ed.2d 684; *Propper v. Clark*, 337 U.S. 472, 486–87, 69 S.Ct. 1333, 93 L.Ed. 1480. We cannot say that the trial judge was clearly wrong in his ruling here, in my opinion.

### C

### *The trial court's findings of negligence by the BIA*

The majority opinion also reverses on the ground that the findings of negligence against the Government were clearly erroneous, and I must disagree.

It is important again to focus on how this accident occurred and the particular acts of negligence which the trial court found to have been a proximate cause of the tragedy. It is undisputed that, as the court found, in the darkness the Fellars family "drove their car and trailer off the end of the washed out approach road into the flood . . . ." (Finding of Fact 12, R. VIII, 163).[6] Thus it was the washing out of the approach road and not a collapse of the bridge which caused the accident.

---

**5.** This is apparently a case arising out of the same storm occurring about September 4–6, 1970, as the instant case.

**6.** Plaintiffs' Exhibit 2n and other exhibits are terribly impressive. They show graphically the gaping hole where the Fellars drove off the approach road in the dark, after its loose materials washed out.

The court found that at the location of the bridge there was a broad flood plain with two evident stream channels, one used by low water flow and a wider curving channel that was evidently the course of the stream during flood periods; that the bridge was located across the low flow channel. (Findings of Fact 4, 5 and 6, id. at 160–61). The court then found that the Government was negligent and that its acts of negligence "were a proximate cause of the erosion and flood break-through of the entire approach road . . .". (Finding of Fact 11, id. at 163).

The acts of negligence found were essentially that the approaches were made of loose, essentially finely grained material, with a minimal, inconsequential amount of rock, and no protective riprap to prevent erosion; that the construction focused the high water flow channel against the end of the approach road; that some effort was made by a diversionary dike to direct the flow of flood waters under the bridge but "it was poorly designed and constructed of loosely defined materials and had not been adequately maintained, and the diversionary works could not reasonably be expected to direct a flood of any serious proportions, such as this, under the bridge without threatening the security of the bridge approach where the primary force of the flood could be expected to strike." (Findings of Fact 6, 7 and 8, R. VIII, 161).

The court further found that a reasonably prudent engineer would have constructed and placed the bridge, approaches and diversionary works so as to bridge the flood channel, or alternatively would have more efficiently shaped and built the diversionary works and substantially strengthened the materials and reinforced the approaches to avoid the type of breakthrough that happened. (Findings of Fact 9 and 10, id. at 162).

The majority opinion does not actually question any of these specific findings of negligence. Instead, the opinion reasons essentially that the ultimate finding of Government negligence [7] is wrong and that the Government is absolved of liability because of other circumstances—(1) that the State of Utah designed the *bridge* and determined its location; (2) that the bridge design was based on a 25-year design frequency, which was all the State could justify spending funds for; (3) that the BIA was not negligent in designing the approach roads since the bridge design required that the approach roads be placed in the flood channel; and (4) that the approach plans were approved by the State and complied with FP–61 federal standards. In my judgment, none of these points can withstand analysis against this record.

As to point (1), regardless of where the State said the bridge would be or the nature of the bridge design, there was no reason why the approach road should not have been adequately designed and constructed with protective riprap and a proper diversionary dike built to protect the vulnerable approach.[8] In fact, the State's se-

---

7. After making its specific findings of negligence, the trial court found that negligence of agents of the defendants was responsible for the deficiencies enumerated and that said acts of negligence were a proximate cause of the erosion and flood breakthrough of the entire approach road. (Finding of Fact 11, R. VIII, 162–63).

8. The plaintiffs presented three civil engineers, two with a doctor's degree and one with a master's degree, who testified to the improper direction of the stream flow by the diversionary dike and to the need for riprap in the construction of the approaches and the dike. (R. III, 374–75; R. IV, 416–17; 426–28; 500–505; and 507–12).

The Government presented evidence that rocks were used in the construction of the dike and the approaches. Generally, the Government's witness stated that most of the rocks were about 12 to 18 inches in size. (R. V, 686, 717, 774, 756, 761, 818). One Government witness testified the rocks were up to two feet in size and two said up to 3 or 4 feet in size. (Id. at 699, 717, 805). One Government witness testified that there were only "six or eight" three to four foot boulders. (Id. at 850). One Government witness on cross-examination stated that the rocks over 18 inches were not placed so as to protect the embankment against the flowing water, but were merely bulldozed into the road fill in order to "take them off the right-of-way. (Id. at 765). Another Government witness testified there was no

lection of the bridge location underlined the necessity of those protective features.

As to point (2) and the 25-year design frequency of the *bridge*, the majority opinion notes that there was conflicting testimony on the frequency with which a storm of these proportions could be expected to recur. This made the reasonableness of preparations for storm possibilities a question of fact. *L. H. Bell & Associates, Inc. v. Granger*, supra, 543 P.2d at 433. In our case the trial court found that the expert testimony was in conflict with respect to the size of the flood and the scientific ability to reasonably predict the frequency of its recurrence; that the physical evidences were such as to serve notice that floods of significant proportions had occurred before; that the main channel of such floods was plainly visible; and that a prudent engineer would have been on reasonable notice of the prospect of a flood of the character in question as a defense. And, again, we must remember it was the approach and not the bridge which washed out.[9]

The claim of lack of State funds for more adequate designing is not persuasive,[10] and

in any event the part taken by the State in the project does not absolve the Government of its liability for concurrent negligence by its acts which were found to be "a proximate cause" of the washout of the approach. Under Utah law separate acts of negligence which do not occur simultaneously can both be proximate causes of an accident so long as the second act is not a supervening cause. *Jacques v. Farrimond*, 14 Utah 2d 166, 380 P.2d 133, 134; *Toma v. Utah Power & Light Co.*, 12 Utah 2d 278, 365 P.2d 788, 794–95; *Hillyard v. Utah By-Products Co.*, 1 Utah 2d 143, 263 P.2d 287, 289–90.[11]

As to point (3), the fact of state approval of the plans for the approach in no way relieves the Government of liability for its negligence in preparing the design and constructing the faulty approach road and diversionary dike. *L. H. Bell & Associates, Inc. v. Granger*, supra, 543 P.2d at 433. In fact, neither federal nor state "approval" sets the standard of care or insulates the Government from liability for negligence in designing and building the approach road and dike.

---

effort to "tie" the boulders in the form of riprap. (Id. at 850).

The plaintiffs presented ample evidence to support the trial judge's finding that materials used were inadequate. Six witnesses testified for the plaintiff that the approach road embankment and dike were loosely packed and that they did not observe any rocks over 12 inches in either the embankment of the approach road or the diversionary dike. (R. I, 13, 15, 22, 60–61, 62, 68, 73, 80; R. II, 118, 124, 145; R. III, 235, 264–65, 278). The plaintiffs' witnesses also testified that the diversionary dike was washed away by the first "high flow" of the stream within three months after the project was completed. (R. I, 17, 87, 93; R. II, 118–119, 151; R. III, 234). *One of the Government's witnesses did state that he observed the dike was in place in 1969. (R. V, 801–804).*

9. *Actually, there was testimony by a Government engineer that the approach was designed to wash out before the bridge. (R. V, 706). And it is clear that the bridge itself was still standing after the accident occurred. (See Plaintiffs' Exhibits 10c through 10m).*

10. A witness for the plaintiff estimated that cost of installing riprap in the approach road embankment would have been "approximately $10,000." (R. IV, 417).

11. Insofar as the designation of the bridge location by Utah is concerned, that step could not be a "supervening cause" since it obviously preceded the designing and construction of the approach road and diversionary dike by the Government. Furthermore, the subsequent State acts cannot be said to be a supervening cause, freeing the Government of liability. After enumerating the BIA deficiencies in designing and constructing the approach road and diversionary dike the trial judge found (Finding of Fact II, R. VIII, 163):

> That said deficiencies were integrated into the construction in such a way that the subsequent acceptance and maintenance of the bridge and approach road by the State of Utah did not break the chain of causation between the negligent acts and the erosion and breakthrough.

Where state law would impose liability on two parties as joint tort feasors, the Government may be held jointly and severally liable for its concurrent negligence: *E. g., H. L. Properties, Inc. v. Aerojet-General Corp., et al.*, 331 F.Supp. 1006, 1009–1010 (S.D.Fla.), affirmed per curiam, 468 F.2d 1397 (5th Cir.).

As to point (4), the Government argues that all the BIA construction "comported with the applicable federal specification requirements, namely FP–61,"[12] (Brief for the Appellants, 5), citing some testimony touching on compaction tests and the slopes of the approach roads, but not dealing with the central problems of the use of loose, fine materials and the absence of riprap. Moreover, the argument is not responsive to the finding that the manner of construction focused the high water flow channel against the end of the approach road. (Finding of Fact 7, R. VIII, 161).

In any event, the trial court found that loose material was used on the approach road with a minimal amount of rock and that there was no protective riprap to prevent erosion. He also found that loose material was used in the diversionary dike. (Findings of Fact 6 and 8, R. VIII, 161). These findings are clearly supported by the record, see note 5 supra, and thus the claim of compliance with FP–61 standards as they are stated is wholly untenable. (See FP–61, Sec. 510, "Loose Riprap", pp. 334–35, specifying requirements for riprap content in terms of amount of given sizes of rock to be used, among other things).

In sum, to me the specific findings of negligence by the trial court are strongly supported by the record. Rejection of them by the majority's process of generalization, and without demonstrating that any of the findings is clearly erroneous, is wholly unwarranted in my opinion. I am firmly convinced that the trial judge was on solid ground in awarding recovery for this tragedy under the Tort Claims Act—relief which was clearly intended by Congress in enacting this remedial statute. I cannot agree to set the judgment aside.

---

**12.** The Government has not demonstrated the weight that should be given to the federal "Standard Specifications" in this case where the general measure of liability is supplied by state law. See 28 U.S.C. § 1346(b); *Rayonier, Inc. v. United States*, 352 U.S. 315, 318, 77 S.Ct. 374, 1 L.Ed.2d 354. The trial judge used as a standard that of a "prudent engineer" and a "reasonably prudent engineer," see Findings of Fact 9 and 10, R. VIII, 162, and this appears to be a proper standard.