Karen Lee MILLER, individually; Earl Edward Miller, individually, Plaintiffs-Appellants,

v.

UNITED STATES of America, DEPARTMENT OF TRANSPORTATION (including the National Highway Traffic Safety Administration), Defendants-Appellees.

No. 79–1605.

United States Court of Appeals, Tenth Circuit.

June 17, 1983.

Certiorari Denied Oct. 31, 1983. See 104 S.Ct. 352.

Jeffrey S. Pop, Beverly Hills, Cal. (Thomas G. Hahn of Pop & Hahn, Beverly Hills, Cal., and Michael M. McGloin of Arkin, McGloin & Davenport, Denver, Colo., with him on the briefs), of Pop & Hahn, Beverly Hills, Cal., for plaintiffs-appellants.

Sandra Wien Simon, Washington, D.C. (Alice Daniel, Acting Asst. Atty. Gen., Leonard Schaitman and Robert Kaplan, Attys., Dept. of Justice, Civil Division, Appellate Staff, Washington, D.C., and Joseph F. Dolan, U.S. Atty., Denver, Colo., with her on the brief), of Dept. of Justice, Civil Division, Appellate Staff, Washington, D.C., for defendants-appellees.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiffs-appellants brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (FTCA), and the Federal Highway Safety Act, 23 U.S.C. §§ 401 *et seq.,* for personal injuries resulting from an automobile accident which occurred December 18, 1977, on U.S. 6 (Interstate 70) in Garfield County, Colorado. Prior to discovery the district court granted defendant's motion to dismiss, basing its decision on the pleadings and affidavits and thus entering a summary judgment for the defendants on two grounds: (1) that the discretionary function exception, 28 U.S.C. § 2680(a), precludes any liability of the United States for its acts or omissions in connection with this cause; and (2) that any negligent acts or omissions of the State of Colorado were those of an independent contractor for whose negligence the United States could not be held liable. We affirm the district court's judgment.

I

Plaintiffs, husband and wife Earl and Karen Miller, were driving their Volkswagen "bus" eastbound on U.S. 6 (Interstate 70), approximately three miles east of the Garfield-Mesa County line in Colorado, near mile marker 67, when the vehicle skidded off the slippery roadway onto a narrow shoulder and down a steep embankment. (Complaint ¶¶ 7, 8). As a result of this tragedy, Karen Miller is a paraplegic. (Complaint ¶ 23). Following administrative denial of plaintiffs' tort claims (Complaint ¶ 9), they filed this action for general damages, medical expenses, property damage, lost earnings, and loss of consortium.

Plaintiffs allege that defendants United States and the Department of Transportation [1] failed to inspect construction plans to

---

**1.** Although the caption of the complaint names the Department of Transportation as a defend-

ant, an action under the FTCA may be brought only against the United States and not against

assure compliance with the Government's own design criteria as mandated in the National Cooperative Highway Research Program Reports Nos. 54 and 118, as well as other Government manuals and regulations. (Complaint ¶ 5). Plaintiffs state that the highway "was regulated, inspected, controlled and designed by Defendant United States, and said Defendant United States was charged with the duty of approving, supervising and inspecting the designing and building of [the highway], as well as monitoring safety features, controlling, maintaining, repairing and keeping in a safe condition [the highway] for the use of the public." (Complaint ¶ 10). They aver that the United States, in carrying out its duties of supervising, inspecting, designing, building, repairing and maintaining the highway in a safe condition, negligently caused this portion of highway to exist with a deficiently narrow shoulder which sloped excessively away from the roadway; that the highway sloped downhill and that there was a severe dropoff which could not be observed by a motorist exercising reasonable care; that the Government knew or should have known that snow or icy conditions would exist and failed to place signs and negligently allowed the highway to be deceptively marked so as to increase danger to eastbound travelers at or near the accident site; that the defendant United States failed to install a guardrail or other device and failed to correct the defectively designed shoulder. (Complaint ¶¶ 11–16).

Plaintiffs state that the United States had authority and means available to have posted signs, markings and devices to warn of the dangerous condition and to install guardrails to rectify the condition (Complaint ¶¶ 18–19); that the Government knew or should have known that the acci-

dent site was dangerous and that there had been numerous accidents involving serious injury in the area (Complaint ¶ 20); that the Government negligently failed to follow its normal and established highway safety criteria, which demand utilization of warning and safety devices such as guardrails on interstate highways at places similar to the site of the accident. (Complaint ¶¶ 21–22). Plaintiffs allege further during 1970 or 1971 the United States approved construction plans and provided funding to the State for improvement and widening of U.S. 6 in Garfield County. (Complaint ¶ 3). The second count of the complaint alleged federal question jurisdiction and asserted a claim under the Highway Safety Act, 23 U.S.C. §§ 401 et seq., and incorporated the foregoing factual averments. Count three presented a claim against the Government for negligent infliction of emotional distress on Karen Miller. The fourth and fifth counts are Earl Miller's claims against the United States for negligence and loss of consortium.

In February 1979 plaintiffs served their complaint and a demand for production of documents, request for admissions, and interrogatories.[2] The Government filed its motion to dismiss or for summary judgment in April and at the same time requested a protective order staying all discovery, pending disposition of the motion to dismiss.[3] (I R. 11). Plaintiffs responded with an affidavit of counsel requesting a stay of summary judgment proceedings pending completion of discovery, pursuant to Fed.R.Civ.P. 56(f), and outlining the reasons that the plaintiffs could not, without discovery, file responsive affidavits or otherwise be prepared to meet the motion for summary judgment. (I R. 64–65).

an agency. 28 U.S.C. § 2679(a); *Holmes v. Eddy,* 341 F.2d 477, 480 (4th Cir.), *cert. denied,* 382 U.S. 892, 86 S.Ct. 185, 15 L.Ed.2d 149 (1965).

2. The contents of these discovery requests are not revealed by the record on appeal. The discovery requests were served by certified mail on February 20, 1979. On April 10, at the Government's request, the parties stipulated to

an extension of time (to April 26) for the Government's compliance with the discovery requests. A second stipulation, approved by the court on April 11, further extended the time to May 6.

3. The only basis asserted for the protective order was that disposition of the motion to dismiss or for summary judgment would preclude the need for discovery.

In support of its motion to dismiss or for summary judgment, the Government filed the affidavit of A.J. Siccardi, Division Administrator of the Federal Highway Administration (FHWA). (I R. 38; hereafter the Siccardi affidavit).[4] The affidavit outlined the statutory procedures for construction of federal-aid highways and briefly recounted events in 1951 and 1952 relating to funding and approval of the relevant stretch of U.S. 6. A "Project Agreement" dated March 23, 1951, and reflecting the agreement between the United States and Colorado, was attached to the affidavit.[5] (I R. 39–42). Neither the Siccardi affidavit nor the Project Agreement discloses any events after May 29, 1952.[6]

The relevant stretch of highway was constructed in 1951 under the Federal-Aid Highway Act, 23 U.S.C. §§ 101 et seq., according to the Siccardi affidavit. The State of Colorado determined the location and design of the section of road, acquired the right of way, prepared plans, specifications, and cost estimates, and submitted the same to the Public Roads Administration, Federal Works Agency for approval. (I R. 37–38). Approval was given, thus making the project eligible for federal highway funding of approximately 50% of the total estimated cost. (I R. 38, 41). In return for the federal funds, the State contracted to construct and maintain the highway. (I R. 38, 39–42). The State awarded the construction contract, and the Public Roads Administration concurred in the award. (I R. 38). The United States inspected and approved the project in 1952 after construction was completed. (I R. 38).

Before ruling on the discovery matters, the district court held a hearing and announced entry of judgment for defendants on May 16. In his oral ruling the judge stated that his review of the brief of defendant, the Siccardi affidavit and a copy of the project agreement between the Government and the State of Colorado led him "to the conclusion that both the defendants' motion to dismiss for failure to state a claim and the motion for summary judgment should be granted." (II R. 4). The ruling was based on the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a), and on the immunity of the Government for acts of Colorado, an independent contractor.

## II

## THE STATUTORY FRAMEWORK

Two statutory schemes are pertinent to the issues before us. The first, the Federal-Aid Highway Act (the Highway Act), first beginning with enactment of the Federal-Aid Road Act of 1916, and now codified at 23 U.S.C. §§ 101 et seq., was intended to stimulate and accelerate the nation's developing highway system by providing federal financial aid for approved state highway construction projects. *D.C. Federation of Civic Ass'ns v. Airis,* 391 F.2d 478 (D.C.Cir. 1968). A state seeking funds under this scheme of federal aid must submit a pro-

---

**4.** Thus this motion was a "speaking motion" and is considered as one for summary judgment. Fed.R.Civ.P. 12(b).

**5.** While the affidavit recites that a project agreement was entered into between the State and the FWHA, the Project Agreement appears to be between the State and the Public Roads Administration.

**6.** The "Project Agreement" contains the following provisions:

The [Colorado] Highway Department will construct or cause to be constructed to final completion said project, in strict compliance with said plans and specifications, which are by reference made a part hereof, under its direct supervision, which shall include adequate inspection throughout the course of construction, subject at all times to inspection and approval by the Public Roads Administration and in accordance with the laws of said State, Federal regulations hereinbefore mentioned....
I R. 40.

\* \* \* \* \* \*

The [Colorado] Highway Department will maintain said project in compliance with [the Federal-Aid Highway Act], and acts amendatory thereof or supplementary thereto, ... [and] the [Colorado] Highway Department will use every means within its power to insure proper and permanent maintenance of said project.
I R. 41.

gram of proposed projects, together with any required plans, specifications and cost estimates,[7] to the Secretary of Transportation who may approve them in whole or in part.[8] 23 U.S.C. § 105(a). Federal approval of plans and specifications is required for funding. *Id.* at § 106(a); 23 C.F.R. § 630.-203(d) (1977). Approved projects must be "conducive to safety, durability, and economy of maintenance ... [and] constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality." 23 U.S.C. § 109(a)(1), (2). Since 1966 this statute has required the Secretary in approving programs to "give priority to those projects which incorporate improved standards and features with safety benefits." *Id.* at § 105(f). Construction standards adopted by the Secretary in cooperation with state highway departments must be applied uniformly throughout the states. *Id.* at § 109(b). The location, form and character of informational, regulatory and warning signs on federal-aid highways are "subject to the approval of the State highway department with the concurrence of the Secretary, who is directed to concur only in such installations as will promote the safe and efficient utilization of the highways." *Id.* at § 109(d).

Although approved projects must be "conducive to safety, durability, and economy of maintenance," 23 U.S.C. § 109(a)(1), they must also "conform to the particular needs of each locality," *id.* at § 109(a)(2), including, for instance, minimization of possible soil erosion. *Id.* at § 109(g). The breadth of the various factors Congress requires the Secretary to consider is shown in part by 23 U.S.C. § 109(h):

Not later than July 1, 1972, the Secretary, after consultation with appropriate Federal and State officials, shall submit to Congress, and not later than 90 days after such submission, promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the *best overall public interest,* taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:

(1) air, noise, and water pollution;

(2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;

(3) adverse employment effects, and tax and property value losses;

(4) injurious displacement of people, businesses and farms; and

(5) disruption of desirable community and regional growth.

Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines. (Emphasis added).

Projects may be approved despite nonconformance to design criteria "after due consideration is given to all project conditions such as maximum service and safety benefits for the dollar invested . . . ." 23 C.F.R. § 625.5(b)(2) (1977).

---

7. The policies and guidance for preparing plans and specifications are found at 23 C.F.R. § 630.204 (1977):

Plans and specifications shall describe the location and design features and the construction requirements in sufficient detail to facilitate the construction, the contract control and the estimation of construction costs of the project. The estimate shall reflect the anticipated cost of the project in sufficient detail to provide an initial prediction of the financial obligations to be incurred by the

State and FHWA and to permit an effective review and comparison of the bids received.

8. Originally federal responsibilities under the Federal-Aid Highway Program resided in the office of the Secretary of Agriculture. They were later transferred to the Secretary of Commerce. When the Department of Transportation was created in 1966, these functions were assumed by the Secretary of Transportation. 49 U.S.C. § 1655. The term "Secretary" shall refer to the Secretary of Transportation.

Construction of approved highways is undertaken by state highway departments, or under their supervision, and, with one exception not relevant here,[9] is subject to the inspection and approval of the Secretary. 23 U.S.C. § 114(a).[10] Construction must be in accord with applicable federal laws and the laws of the state. *Id.* Maintenance is also the duty of the state. *Id.* at § 116(a). If the state improperly maintains the highway, the Secretary must give notice to the highway department and if the condition is not rectified in 90 days, the Secretary must withhold approval of projects within the state until proper maintenance is obtained. *Id.* at § 116(c).

The second pertinent statutory scheme, the Highway Safety Act, 23 U.S.C. §§ 401 *et seq.* (the Safety Act), enacted in 1966, directs the Secretary of Transportation to assist and cooperate with federal, state and local Governments, and other interested parties, to increase highway safety. 23 U.S.C. § 401. The Safety Act requires each state to have highway safety programs in accordance with uniform standards promulgated by the Secretary. *Id.* at § 402(a). The uniform standards shall include, but not by way of limitation, provisions for "highway design and maintenance (including lighting, markings, and surface treatment)," accident record systems, and "surveillance of traffic for detection and correction of high or potentially high accident locations ...." *Id.* The Secretary shall not approve any State highway safety program unless the program provides that the Governor be responsible for administration of the program. *Id.* at § 402(b)(1)(A). Af-

ter 1969, if a state is not implementing such a safety program approved by the Secretary he may not apportion safety funds to that state. *Id.* at § 402(c). However, the Secretary is not commanded "to require compliance with every uniform standard, or with every element of every uniform standard, in every State." *Id.*

To implement these statutory provisions, Federal Highway Administration regulations set forth standards, specifications, policies and guides approved for application to federal-aid highways. Highway design standards and specifications are defined as "those design principles and dimensions derived from basic engineering knowledge, experience, research, and judgment that are officially designated and adopted by highway authorities as the specific controls for design of highways." 23 C.F.R. § 625.2(a) (1975). Highway design policies are defined as "general procedures and controls which are less specific than design standards, often with a range of acceptable values, and which are officially adopted or accepted for application in the design of highways." *Id.* at § 625.2(b). "Highway design guides include information and general controls that are more flexible and indefinite than policies but which are valuable in attaining good design and in promoting uniformity." *Id.* at § 625.2(c).

By regulations of the Federal Highway Administration in 1975, the following publications were approved, *inter alia,* as, respectively a policy and a guide for application on Federal aid projects: (1) the American Association of State Highway Officials', *A Policy on Geometric Design of Rural High-*

---

**9.** Under 23 U.S.C. § 117, the Secretary may discharge certain responsibilities under the Highway Act by accepting a certification from a state highway department providing the Secretary "finds such projects will be carried out in accordance with State laws, regulations, directives, and standards which will accomplish the policies and objectives contained in or issued pursuant to this title." This certification procedure does not apply to the interstate highway system, such as that portion of highway where plaintiffs were injured.

**10.** The regulations discussing this inspection function disclose that "it is the policy of [the

Federal Highway Administrator] that FHWA personnel make sufficient inspections of Federal-aid highway construction projects to assure that each project is completed in reasonably close conformity with the approved plans and specifications...." 23 C.F.R. § 637.105 (1977). The regulations require an initial and final inspection and permit "other inspections of the type and frequency deemed necessary by the Division Administrator." *Id.* at § 637.-109(a). The initial and final inspections may be combined on small projects or those of short duration. *Id.*

*ways* (1965), which prescribes 10 to 12 foot shoulders on highspeed highways (p. 235); standards for shoulder slope (pp. 237–38) and cross-slope break between road and shoulder (maximum 6–7%, p. 237); lane widening at curves (pp. 183–89); and placement of guardrails (pp. 242–43); and (2) the Highway Research Board, National Cooperative Highway Research Program (NCHRP) Report No. 118, *Location, Selection and Maintenance of Highway Traffic Barriers* (1971), which was identified in the complaint (¶ 5; I R. 2) and describes where guardrails should be located (pp. 2–5). 23 C.F.R. § 625.3(b)(1), (c)(6) (1975).

The more specific standards and specifications adopted list the AASHO's, *Geometric Design Standards for the National System of Interstate and Defense Highways* (1967) and the Federal Highway Administration's *Manual on Uniform Traffic Control Devices for Streets and Highways* (1971). 23 C.F.R. § 625.3(a)(2), (4) (1975). In 1977, the AASHO's *A Policy on Geometric Design of Rural Highways (1965)* and *Geometric Design Standards for the National System of Interstate and Defense Highways* (1967) were approved for application on federal aid highway projects. 23 C.F.R. § 625.3(a)(1), (3) (1977). The safety related criteria of the referenced standards were established as *"goals* for developing State and local safety programs for all public highways as required by Highway Safety Program Standard 12, 23 C.F.R. 1204.4." 23 C.F.R. § 625.3 (1977). (Emphasis added).

The standards and policies are subject to exceptions. Approval can be given on a project basis to designs not conforming to minimum criteria set forth in the standards and policies listed in 23 C.F.R. § 625.3(a) and (b), where, *inter alia,* "unusual conditions warrant that exception be made." 23 C.F.R. § 625.4(b)(3) (1975). The exceptions are subject to the following proviso:

The determination to approve a project design that does not conform to the minimum criteria is to be made only after due consideration is given to all project conditions such as maximum service and safety benefits for the dollar invested, compatibility with remaining sections of unimproved roadway, and the probable time before reconstruction of the section due to increased traffic demands...

*Id.* at § 625.4(b)(3) (1975); *see also* § 625.-5(b)(2) (1977) (containing substantially similar language).

## III

## THE DISCRETIONARY FUNCTION EXCEPTION TO FTCA LIABILITY

We begin by noting that the Federal Tort Claims Act (the FTCA) waives sovereign immunity "in sweeping language," *United States v. Yellow Cab Co.,* 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951), and authorizes suit against the United States for negligence "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The broad waiver of sovereign immunity is limited by the discretionary function exception of 28 U.S.C. § 2680(a), *inter alia.*[11] Exceptions to the FTCA are to be narrowly construed. *First Nat. Bank in Albuquerque v. United States,* 552 F.2d 370, 376 (10th Cir.1977); *Smith v. United States,* 546 F.2d 872, 877 (10th Cir.1976). However, the discretionary function exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Baird v. United States,* 653 F.2d 437, 440 (10th Cir.1981); *accord, Smith v. United States,* 546 F.2d 872, 875–76 (10th Cir.1976).

---

11. This section states in pertinent part:
The provisions of [the FTCA] shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

█ We have said that "[g]enerally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." *Jackson v. Kelly,* 557 F.2d 735, 737–38 (10th Cir.1977) (en banc). Stated somewhat differently, we have observed "that if a government official in performing his statutory duties must act without reliance upon a *fixed or readily ascertainable standard,* the decision he makes is discretionary and within the [discretionary function exception]. Conversely, if there is a standard by which his action is measured, it is not within the exception." *Barton v. United States,* 609 F.2d 977, 979 (10th Cir.1979) (emphasis added). The requirements, duties and functions imposed by the statutes and regulations involved here lead us to the conclusion that the alleged acts and omissions complained of are within the discretionary function exception of 28 U.S.C. § 2680(a). The statutes and regulations at issue fail to provide a fixed or readily ascertainable standard, and decisions made pursuant to them require more than expert evaluation of a mandatory duty. *Cf. Griffin v. United States,* 500 F.2d 1059, 1062–65 (3d Cir.1974).

From the beginning of the federal-aid highway program there has been a preeminent Congressional concern with state autonomy in construction and maintenance, along with the safeguarding of federal funds. *See, Mahler v. United States,* 306 F.2d 713, 716–720 (3d Cir.1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. The increasing frequency of federal-aid highway safety legislation, culminating for our purposes in the 1966 passage of the Safety Act, has not altered this salient feature. The report accompanying the Safety Act noted that "the [Public Works Committee] draws attention to the need for flexibility in formulating and administering standards in other matters [besides uniform sign, signalling, motor vehicle inspection and driver licensing standards] which are conditioned by topographical differences, traffic loads, or other significant regional variables." S.Rep. No. 1302, 89th Cong., 2d Sess. *reprinted* in 1966 U.S.Code Cong. & Ad.News, 2741, 2745. Flexibility was built into the Safety Act funding provisions which committed 25% of those funds to use at the "administrative discretion" of the Secretary, while requiring 75% to be apportioned on the basis of population. 23 U.S.C. § 402(c).[12] While Congress acknowledged the usefulness of uniform standards in enhancing highway safety, it nonetheless did not require the Secretary to demand state compliance with all uniform standards.[13] *Id.*

Keeping in mind that the Secretary is directed to evaluate each project in light of the "best overall public interest," *see* 23 U.S.C. § 109(h), we turn now to the various authorities urged by the parties in determining the scope of the discretionary function exception. We note first our decision in *Wright v. United States,* 568 F.2d 153 (10th Cir.1977), where we held that § 2680(a) barred a suit based on allegedly negligent design, placement, construction, inspection and management of a bridge and its approach roads by the Bureau of Indian Affairs. To be sure, the statutory authorization for federal participation with the State of Utah in the project, 23 U.S.C. § 208, was different from the statutory provisions pertinent here. However, in *Wright* we observed that the discretionary function exception applied not only to the "initiation of programs and activities," but also to "determinations made by executives

**12.** In connection with the allocation of 25% of highway safety funds to the Secretary, "[t]he [Public Works Committee] views the discretionary authority of the Secretary as an important and desirable provision ...." S.Rep. No. 1302, *supra,* at 2747.

**13.** When this "noncompliance" language was added in 1975, the committee reporting the·bill stated that its purpose was to "amend section 402 to make it clear that section 402 confers broad discretionary authority upon the Secretary with respect to approval of State highway safety programs ...." H.Rep. No. 94–716, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Ad.News, 798, 819.

or administrators in establishing plans, specifications or schedules of operations." *Wright,* 568 F.2d at 158, *quoting, Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–69, 97 L.Ed. 1427 (1953).

We stated that the Bureau of Indian Affair's "decision to aid and assist the State of Utah in constructing the bridge and approach ways in this case comes within the discretionary exemption of the [FTCA, and] neither its adoption *or implementation* of 'plans, specifications, or schedules of operations' for the project gave rise to a viable cause of action...." *Wright,* 568 F.2d at 159 (emphasis added). While *Wright* is distinguishable in some respects from the instant case, and while it relies on three independent theories in reaching its conclusion, it is nonetheless indicative of the scope of the discretionary function exception as it applies to federal activities connected with road building and maintenance.

Plaintiffs place heavy emphasis on *Griffin v. United States,* 500 F.2d 1059 (3d Cir.1974), a decision we have recognized as sound and well-reasoned. *See First National Bank in Albuquerque v. United States,* 552 F.2d 370, 375 (10th Cir.1977). In *Griffin* the Government argued that § 2680(a) barred plaintiffs' action for Government negligence in violating biological standards implemented by the Department of Health, Education and Welfare (HEW) to be used in testing polio vaccine lots for safety. The Third Circuit rejected the Government's construction of the discretionary function exception as too broad. 500 F.2d at 1063.

The tests required by HEW, through a promulgated regulation, involved five criteria of a highly scientific nature for evaluating the vaccine's safety. *See, id.* at 1062–65, nn. 7, 11, 12 & 13.

*Griffin,* we feel, is quite different from the circumstances at hand. Though the Third Circuit noted that evaluation of the vaccine's safety required judgment, it stated: "Where the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a 'discretionary function.'" *Id.* at 1066. The court carefully distinguished the situation before it from one involving the balancing of "competing policy considerations in determining the public interest." *Id.* Thus the breach of pre-existing statutory and regulatory requirements by the unauthorized reliance on a different factor in releasing the polio vaccine was held to be outside the discretionary function exception in *Griffin. Id.* at 1067, 1069. We acknowledge that perhaps discovery herein could reveal, *e.g.,* engineering guidelines with some similarities to the scientific evaluation called for in *Griffin.*[14] However, we are convinced that the "best overall public interest," the needed flexibility, and the discretionary elements inherent in the federal responsibilities cited by plaintiffs with regard to highways (*see* Part II, *supra*), call for a markedly different type of evaluation than that

---

**14.** For instance, Appendix B to Plaintiffs' Supplemental Memorandum relies on a portion of AASHTO's *Guide for Selecting, Locating and Designing Traffic Barriers (1977),* which sets forth graphs and complex mathematical equations for determining when a guardrail or traffic barrier is warranted. Variables in the graphs and equations include shoulder slope, embankment slope, vehicle velocity, vehicle encroachment angle, shoulder slope tangent point, side slope tangent point, lateral rounding distance, etc. However, as the Government notes, Section I–C to the Guide (entitled "Application of Guide") states in pertinent part (emphasis in original):

The contents of this document are intended as *guidelines* for those responsible for the design, installation, and maintenance of traffic barriers .... [T]he chapter on cost-effectiveness can be used to evaluate the effects of traffic conditions on traffic barrier needs.

... It is recognized that limited budgets may preclude the full implementation of these guidelines. In those cases, a priority system should be established to insure that cost-effective alternatives are employed.

The guide relates primarily to the *protective* aspects of traffic barriers. These guidelines must be considered together with social, environmental, and economic factors.

The advisory character of the Guide, particularly when viewed in its statutory and regulatory setting, is therefore quite distinct from the mandatory testing standards at issue in *Griffin.*

undertaken in *Griffin*.[15] We are persuaded that the acts and omissions alleged were not violations of specific, mandatory requirements, and they instead did involve policy and competing considerations to such an extent that they were within the discretionary function exception. *See First National Bank in Albuquerque v. United States,* 552 F.2d 370, 375–76 (10th Cir.1977).

Plaintiffs further argue that the Government's failure to require a warning of the known dangerous condition cannot rationally be dismissed as within the discretionary function exception. *See Smith v. United States,* 546 F.2d 872, 877 (10th Cir.1976). We are convinced that any such omission respecting warnings is not actionable here.[16] We are guided in part by the reasoning of *Spillway Marina, Inc. v. United States,* 445 F.2d 876 (10th Cir.1971). The plaintiff there sued the Government for damages to its facility on the Tuttle Creek Reservoir, sustained when the Army Corp of Engineers released waters from the reservoir to aid navigation on the Missouri River. The complaint alleged, *inter alia,* breach of a duty to warn plaintiff. *Id.* at 877. We held

that the water release was a discretionary function and that the alleged failure to warn "goes to the manner of exercise of a discretionary function," which is immunized from suit by § 2680(a). *Id.* at 878; *see also Smith,* 546 F.2d at 877 (discussing *Spillway Marina* ). In reaching that conclusion, we distinguished *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). We feel that *Spillway Marina* 's discussion of *Indian Towing* is equally pertinent here.

The alleged negligence here concerning warnings, as with our preceding treatment of federal responsibilities, is not confined to the operation of a federal facility, enterprise or undertaking but rather goes to the essence of the Secretary's judgment in fashioning a highway in the "best overall public interest" out of the welter of public policy considerations Congress has designated. *See Baird v. United States,* 653 F.2d 437, 440–42 (10th Cir.1981), and cases cited therein; *First National Bank in Albuquerque v. United States,* 552 F.2d 370, 375–76 (10th Cir.1977); *cf. Yates v. United States,*

---

**15.** Thus we feel *Blessing v. United States,* 447 F.Supp. 1160 (E.D.Pa.1978), is inapposite. The court there noted that plaintiffs could conceivably demonstrate a breach of OSHA inspection standards that would bring that case within the holding of *Griffin. Id.* at 1184. Therefore the Government's Rule 12(b)(1) motion (which was treated as a Rule 12(b)(6) motion) was overruled. We reiterate that further proceedings herein, unlike those allowed in *Blessing,* would be unavailing to plaintiffs under any construction or proof of plaintiffs' allegations when bearing in mind the nature of federal activities related in Part II of this opinion.

It should be apparent that the decisions undertaken here are different from the medical decisions in *Jackson v. Kelly,* 557 F.2d 735 (10th Cir.1977) (en banc). Ordinary medical judgments, such as those in *Jackson,* are unlike the acts or omissions alleged here in that the broad mandate given to the Secretary compels consideration of multitudinous competing policies in arriving at the "best overall public interest," whereas the "discretion" (as that term is used in daily parlance) involved in medical decisions requires determinations no different than those reached by private physicians. *See also,* n. 14, *supra.*

**16.** The decision in *Smith* was premised on the direct acts or omissions of the Government, through its agents as a landowner. We are

mindful that in *Smith* we followed *Foster v. United States,* 183 F.Supp. 524 (D.N.M.1959), *aff'd per curiam,* 280 F.2d 431 (10th Cir.1960); *United States v. White,* 211 F.2d 79 (9th Cir. 1954); *Bulloch v. United States,* 133 F.Supp. 885 (D.Utah 1955); and *Worley v. United States,* 119 F.Supp. 719 (D.Or.1952), on the issue of failure to warn of dangerous conditions. *Smith* 546 F.2d at 877. These decisions were based in material part on either the duties of the Government as a landowner or builder, or on the direct actions of Government agents, once implementation of a policy decision had been undertaken and are, therefore, distinguishable from the instant case. *See, Foster,* 183 F.Supp. at 525 (Bureau of Reclamation contractually bound to perform certain maintenance and construction at canal); *White,* 211 F.2d at 80 (army base); *Bulloch,* 133 F.Supp. at 887 (nuclear detonations); *Worley,* 119 F.Supp. at 720 (Government hunter sets coyote trap during federal eradication program). *See also, Driscoll v. United States,* 525 F.2d 136 (9th Cir.1975); *Ward v. United States,* 471 F.2d 667 (3d Cir.1973); and, *American Exchange Bank v. United States,* 257 F.2d 938 (7th Cir.1958) (examples of potential breaches of Government duties imposed on the Government as landowner, builder or aircraft operator).

497 F.2d 878, 882–83 (10th Cir.1974).[17] We are constrained to hold that § 2680(a) bars the plaintiffs' claims asserted under the Federal Tort Claims Act due to the nature of the Secretary's acts in arriving at the "best overall public interest," which implicated the several policy considerations imposed on the Secretary.

The plaintiffs argue vigorously that the district court abused its discretion by denying them the right to conduct discovery prior to ruling on the Government's motion for dismissal. As noted, the district court conducted a hearing in May 1979. The Government attorney requested an opportunity to argue the motion for a protective order, but the judge announced instead that he was prepared to grant the Government's motion to dismiss. He stated oral findings and conclusions explaining his ruling. Actually, the ruling as made was a summary judgment since the judge referred to matters beyond the complaint, such as the agreement with the State of Colorado. In essence the court held that the plaintiffs' claims could not be asserted under the Federal Tort Claims Act since the matters complained of came within the discretionary function exception. The court further held that the United States was not liable for any action by the State of Colorado on the highway project because it occurred while the State was functioning as an independent contractor. (II R. 2–10).

The plaintiffs say that the court abused its discretion by making the ruling before they were allowed to conduct discovery; that a stay of the summary judgment proceeding should have been permitted pursuant to Rule 56(f), F.R.Civ.P.; that, as stated in counsel's Rule 56(f) affidavit, the plaintiffs intended by discovery to demonstrate that the actions of the Government's agents were operational in character and therefore outside the discretionary exception; and that none of the discovery requests of the plaintiffs had been met by the Government. The plaintiffs argue on appeal in their Supplemental Memorandum that if discovery were permitted they would demonstrate, *inter alia,* that the highway at the accident site was void of "proper" warning signs and that the Department of Transportation employees failed to follow their agency's guidelines and criteria when they inspected and constructed the highway. (*Id.* at 2).

■ We are not persuaded that the district judge committed any prejudicial error here in making his ruling before discovery by plaintiffs was permitted. It is true that discovery is strongly favored and generally denying the right to have full discovery on all pertinent issues before a summary judgment is granted would be error, particularly in the face of a Rule 56(f) affidavit. However, in the instant case we are convinced that there are no facts which plaintiffs could arguably develop to escape the effect of the statutes and regulations. The statutes, regulations and all the publications referred to in the regulations were, of course, available to both sides and the pattern they reveal is one coming within the discretionary function exception. While portions of the standards, specifications, policies, and guides deal with the specifics of engineering criteria for highways, they are not prescribed as mandatory standards such as would bring these claims within the theory of the *Griffin* case, but are instead

---

**17.** In *Baird,* we held that § 2680(a) barred suit against the Government for the Inter-Agency Air Cartographic Committee's preparation of a misleading flight chart. *Baird's* instructive discussion of authorities distinguished the "situation where negligence is confined essentially to the operation of a government facility or enterprise" from "deliberative and judgmental activities in designing and approving" flight charts. *Baird,* 653 F.2d at 441.

The tragic injuries befalling plaintiffs in *First National Bank* were excepted from suit under the FTCA, we held, because the warning and labelling requirements at issue there "called for a judgment in the discretionary area." *First National Bank,* 552 F.2d at 376. It is true that the regulations and requirements for labels there appear far more generalized than those applicable here to the Department of Transportation and its agents. *See id.* at 372–75. Nonetheless we feel that our discussion in Part II of this opinion adequately illustrates the inherent discretionary quality of the federal responsibilities allegedly breached, despite the presence of a more specific statutory and regulatory framework.

part of the overall regulatory scheme involving policy decisions and competing considerations.

In sum, we hold that the plaintiffs' claims asserted under the Federal Tort Claims Act are within the discretionary function exception· and that the district court properly dismissed them.

## IV

## PLAINTIFFS' CLAIMS ASSERTED UNDER THE SAFETY ACT

In the second count of the complaint, plaintiffs invoke federal question jurisdiction and assert a claim under the Safety Act, with no allegation of jurisdiction under the FTCA. (Complaint ¶ 29). We note that the district court did not separately address this independent cause of action in its oral statement announcing its ruling against plaintiffs. We assume that the court was following its general reasoning that no viable claim could be asserted by plaintiffs based on alleged negligence in the Government's functions in connection with the highway system.

■ The Safety Act does not expressly provide a private cause of action in favor of an aggrieved party for the breach of duties imposed by the Act. Our inquiry becomes, then, whether a private cause of action ought to be implied from the statute. We are guided in this inquiry by the factors adumbrated in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).[18] Subsequent formulation and refinement of the *Cort* criteria have indicated that a Congressional intent to create or deny the private remedy asserted is the weightiest factor. *Middlesex Cty. Sewage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13,

101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981) ("[T]he key to the inquiry is the intent of the legislature."); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979).

From its language, there can be little doubt that the principal purpose of the Safety Act was to enhance the personal safety of the motoring public. However, we decline to leap from such a proposition to the conclusion that by enactment of the Safety Act "Congress intended to create, either expressly or by implication, a private right of action." *Touche Ross,* 442 U.S. at 575, 99 S.Ct. at 2488. Rather, it appears that Congress sought to regulate through the incentive of financial aid the previously unregulated activities of state highway departments for the protection and benefit of the separate and distinct classes of highway users, pedestrians, bicyclists and others mentioned in the statute. We note that the Safety Act is phrased more as a general prohibition or command to a federal agency, rather than as an act focusing unmistakably on the benefitted class. *See Universities Research Ass'n v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981). The discussion in *Cannon v. University of Chicago,* 441 U.S. 677, 689–94 & n. 13, 99 S.Ct. 1946, 1953–57 & n. 13, 60 L.Ed.2d 560 (1979) (*see also* cases cited therein), is pertinent in this context. There the Court observed that it "has been especially reluctant to imply causes of actions under statutes that create duties on the part of persons for the benefit of the public at large." *Id.* at n. 13. Given the benefits accruing to motorists through increased safety on federal-aid highways, it is nonetheless not apparent

---

**18.** In *Cort,* the Supreme Court stated:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
442 U.S. at 78, 95 S.Ct. at 2088. (citations omitted; emphasis in original).

that "Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). The Safety Act, we feel, reflects broad societal concerns and lacks the specialized focus, protections or benefits apparent in those statutes where a private remedy has been implied.

Second, the parties have not directed us toward, nor has our independent research uncovered, an explicit or implicit indication of legislative intent to create such a remedy. We acknowledge that this is typically the situation where the legislation in question does not expressly create or deny a private remedy. *Cannon,* 441 U.S. at 694, 99 S.Ct. at 1956. *Compare Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1380 (10th Cir.1981) (clear Congressional intent to create private right of action), *with Chavez v. Freshpict Foods, Inc.,* 456 F.2d 890, 894 (10th Cir.1972), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 535, 34 L.Ed.2d 492 (absence of Congressional intent). However, here we think the pervading legislative purpose disclosed by the historical materials was to encourage research, development and application of safety measures by a financial incentive system to be executed through the state highway departments.

Next, *Cort* directs that we consider whether implying a private remedy against the Government is consistent with the underlying purposes of the Act. Allowing such recovery by the tens of thousands of injured motorists and pedestrians would be beneficial from the standpoint of compensation to them. It would, however, mean an obviously enormous governmental exposure to liability, and we doubt that such a result is consistent with what Congress sought to do by its scheme of beneficial regulations geared to specific appropriations and the apportionment of limited safety funds. Hence we do not feel that this factor militates in favor of implying private rights of action against the Government under the Safety Act.

Finally, *Cort* directs our inquiry into the question whether the claim is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087. Generally, the primary resource for redressing tortious wrongs arising out of automobile accidents is the state civil codes and common law. Such actions are not within the familiar domain of federal interests. However questions underlying the recognition of a right to recover from the Government for such injuries are unique, and hence we do not feel that this last factor is a helpful guide here. These questions are unique because recognizing the right to recover sought here would also involve finding a waiver of the Government's traditional immunity from suit. We are reminded that the United States "is immune from suit save as it consents to be sued," *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), *quoting United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941), and "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Mitchell,* 445 U.S. at 538, 100 S.Ct. at 1351, *quoting United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). We find no such unequivocal waiver in the provisions of the Safety Act.

In sum, we cannot agree that the Safety Act affords a remedy to the plaintiffs on these claims against the Government.

V

For these reasons we agree with the conclusion reached by the district court. We are convinced that the claims asserted under the Federal Tort Claims Act come within the discretionary function exception and that no private cause of action can be maintained by the plaintiffs under the Federal Highway Safety Act. Accordingly the judgment is

AFFIRMED.